## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                            Case No. 06-20172-JWL

TIMOTHY JOE JAMES,

        Defendant.

_____

## MEMORANDUM AND ORDER

The indictment in this case charges defendant Timothy Joe James with being a felon in possession of firearms and ammunition. This matter is before the court on the defendant's Motion to Suppress Evidence (doc. #30) obtained as a result of an allegedly unconstitutional car stop on October 30, 2006, and a search of a residence later that night which collectively resulted in the discovery of firearms, ammunition, and other items. The court held an evidentiary hearing on the motion to suppress on March 28, 2007, and April 3, 2007. After careful consideration of the parties' arguments and the evidence, the court will deny defendant's motion to suppress.

## CAR STOP

**A.**    <u>**Evidence from the Suppression Hearing**</u>

Trent McKinley is a police officer with the City of Lawrence, Kansas.  Officer McKinley was on duty on October 30, 2006, when he received a call to respond to a forgery or bad check investigation at the Clinton Parkway Nursery.  He went to the nursery and visited with the reporting party, Katie Bandy.  Ms. Bandy reported that two individuals had come into the nursery and purchased $278 worth of shrubbery and mulch.  At the time they paid for the goods, she questioned the authenticity of the check.  She asked the owner whether they should accept the check, and the owner told her to go ahead and accept it.  After the two individuals left, Ms. Bandy called Baldwin State Bank and was told the check was no good; the account had been closed and the check would not be honored.

Ms. Bandy provided Officer McKinley with detailed descriptions of the two individuals.  She said they were dressed like bail enforcement officers and had badges hanging around their necks.  She had helped one of the individuals load the shrubbery into the vehicle.  She described this individual as a white male, forty-two to fifty years old, six feet tall, thinner build, light colored eyes, bony face with possibly some acne scars or wrinkles, tanned skin, and clean shaven.  She described the vehicle as a Jeep Cherokee, new, white with black trim, factory-tinted windows, and dirty as if it had been driven on a dirt road.  When she was putting the things in the car she noticed what appeared to be magnetic-type signs for the exterior of a vehicle with some sort of law enforcement reference on them.  When she went back inside, the other individual paid for the goods.  She described him as

2

a white male, about thirty-five years old, approximately six feet three inches tall, medium build, fair skin with light eyes, baseball cap, and baby faced.

After visiting with Ms. Bandy, Officer McKinley recalled a crime analysis bulletin he had seen previously.  The bulletin said that an individual by the name of Brian Schneider was associated with some bail company.  Tim James, the defendant in this case, was mentioned as being an associate of Schneider, and Officer McKinley knew Mr. James as having also worked in the bonding business.  Officer McKinley met with Detective David Anderson, also of the Lawrence Police Department, and learned that earlier that day a second law enforcement bulletin had been presented or prepared.  Officer McKinley looked at that bulletin.  It stated that Mr. Schneider was wanted for a parole violation, that he was from the Wichita area, that there was a bad check writing scheme going on involving him, and that there was an association with the bonding company that was on those checks.  In the same bulletin, Mr. James was mentioned as being an associate of Mr. Schneider.

Based on this additional information, Officer McKinley knew that Mr. Schneider was wanted on a felony warrant and Mr. Schneider was his prime suspect in the bad check investigation.  Officer McKinley did not have a local address for either Mr. James or Mr. Schneider, so he sat and watched traffic for periods of time.  He was initially unable to locate the vehicle.  At about 9:29 p.m. that evening, he had been stationery for some period of time at 9th and Iowa, watching traffic and typing his report into the computer.  As he was sitting in the left turning lane waiting for his light to change, he noticed a vehicle approach the intersection, stop briefly, and make a right turn on red.  He noticed that the vehicle appeared

3

to be exactly the type he had been looking for all night, and in a quick glance as the vehicle was making the right turn he noticed that the driver was a white male.  He pulled out of the left lane, followed the vehicle for a period of time, and caught up to it.  The vehicle fit the description given by Ms. Bandy in that it was a white Jeep Cherokee with black trim, a little dirty, with factory-tinted windows.  Additionally, he recalled that Ms. Bandy had thought the vehicle might be a rental car.  When he ran the tags on the vehicle it came back to a rental car company out of Kansas City.  Officer McKinley testified that this fit Ms. Bandy's description of the vehicle "to a T."  At that point, he stopped the vehicle.

Officer McKinley approached the vehicle and asked the driver for his license.  The driver produced a Kansas identification card rather than a driver's license.  Officer McKinley explained to the driver that he was working on an investigation and the type of vehicle he was driving had been used in a crime earlier in the day.  Officer McKinley asked if the vehicle was his, and the driver stated that it was not; he said it was a vehicle that was leased to a friend of his named Brian Schneider.  When the driver produced the ID card from inside his wallet, Officer McKinley saw a very large silver-colored badge.  He asked if the driver was a police officer, and the driver replied that he was a bail enforcement officer.  The ID card identified the driver as being defendant Timothy James.  Mr. James's production of a Kansas ID card rather than a driver's license was significant to Officer McKinley because often during a traffic stop when someone hands officers an ID card it indicates for one reason or another that the person's driver's license has been suspended or revoked or something along those lines.

4

Officer McKinley advised Mr. James to stay inside his vehicle while Officer McKinley went back and checked his driver's license. Dispatch advised Officer McKinley that Mr. James's driving privileges were listed as suspended. Officer McKinley testified that, under Kansas law, this is an arrestable offense.

Meanwhile, as soon as Officer McKinley saw Mr. James's bail enforcement badge, he had leaned over to his shoulder-mounted microphone and advised dispatch that he needed another unit, so he started getting more officers headed his way. The first backup officer arrived within approximately two minutes of his request for a second unit. This officer was on the passenger side of Mr. James's vehicle while Officer McKinley was still in his patrol car verifying information with dispatch. Another officer arrived within maybe another minute, and yet another officer arrived within another minute and a half.

Officer McKinley walked back up to Mr. James's vehicle and explained to Mr. James that his driver's license was currently suspended and asked him to step out of the vehicle. Mr. James was very compliant. Officer McKinley handcuffed him immediately and moved him to the rear of the vehicle out of the traffic lane. Another officer with a prisoner transport car checked Mr. James for weapons and placed Mr. James in his patrol car.

Officer McKinley decided that the vehicle would be "city contract towed" because the driver of the vehicle had been taken into custody and the vehicle had no rental contract or authorized driver present. Consequently, the officers had to perform a detailed inventory of any items inside the vehicle. Another officer performed the inventory. He found a handgun in the vehicle between the driver's seat and the center console. The way it was situated it

5

would have been next to the driver's leg, sticking up an inch or two above the fabric level of the seat. Thus, once Mr. James stepped out of the vehicle the gun was in plain view when the officer looked inside the vehicle. Other items located in the vehicle included handcuffs, a suction cup-mounted police-style dash light, magnetic signs that said bail enforcement officer, and a personal checkbook with Brian Schneider's name.

**B.** **Discussion**

A traffic stop is a seizure for Fourth Amendment purposes, "'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). A routine traffic stop is more like an investigative detention than a custodial arrest, and therefore such stops must be justified by reasonable articulable suspicion under the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc). To determine the reasonableness of such an investigative detention, the court undertakes a two-step inquiry: the court asks, first, whether the law enforcement officer's action was justified at its inception and, second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.*

In this case, defendant contends that the traffic stop was not justified at its inception because it was not based on a traffic violation or any other serious crime, but instead was based on Officer McKinley's suspicion that the driver of the vehicle was involved in nothing more than a completed misdemeanor offense. If defendant's characterization of the evidence

6

were correct (i.e., that the sole reason for the traffic stop was the worthless check investigation), defendant might be correct that the initial traffic stop was unconstitutional. "[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In this case, the alleged writing of the worthless check was not "afoot," meaning "in progress," Webster's New International Dictionary Unabridged 37 (3d ed. 1993), because it was already completed. A stop is justified, alternatively, if the stopped person "was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985). Here, the government did not meet its burden of proving that the worthless check incident, which involved $278, was a felony.[1] Consequently, the stop would not have been constitutionally justified if Officer McKinley's sole motivation for the stop had been the worthless check incident. *See United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (investigative stop of vehicle may be made where police have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor).

On cross-examination, however, Officer McKinley testified that his motivation for the stop was twofold: "the worthless check matter and the felony warrant service." By felony warrant service, he was referring to the fact that he was aware that Mr. Schneider had a felony warrant for his arrest. Officer McKinley's investigation up to that point had led him

---

[1] There was some suggestion that the incident may have constituted a felony, but the government's evidence on this point was brief and unclear. What little testimony was presented on this issue certainly did not persuade the court that the incident was a felony.

to believe that one of the two individuals involved in the worthless check incident, one of whom he believed to be Mr. Schneider, was likely the individual driving the white Jeep Cherokee. During cross-examination, Officer McKinley admitted that the fact that the traffic stop was motivated in part by the felony warrant was not mentioned in his report. Ultimately, however, the court finds his testimony that he was motivated by both to be credible. Officer McKinley was a very credible witness. He had an excellent demeanor and was articulate and professional. The evidence reflected that the worthless check report from the nursery served as the impetus for Officer McKinley's interest in the white Jeep Cherokee as well as Messrs. Schneider and James. Through Officer McKinley's involvement in that investigation, he also learned that Mr. Schneider had a felony warrant for his arrest. Thus, the felony warrant became part and parcel of the entire investigation. Thus, the fact that the felony warrant was not specifically mentioned in Officer McKinley's report is not necessarily a discrepancy because it can be reasonably inferred that the felony warrant was implicit in his reference to the bad check investigation rather than being something entirely separate. After carefully considering the evidence from the suppression hearing concerning Officer McKinley's motivation for the traffic stop, the court is persuaded that it was indeed motivated by the felony warrant as well as the check investigation. Consequently, the initial traffic stop was justified because Officer McKinley had a reasonable suspicion, grounded in specific and articulable facts, that the driver of the vehicle, who he believed might very well be Mr. Schneider, was wanted for a felony. The court therefore finds defendant's argument that the initial traffic stop was unconstitutional to be without merit.

## WARRANTLESS ENTRY INTO APARTMENT

### A.      Evidence from the Suppression Hearing

#### 1.      Testimony of Officer Trent McKinley

After Mr. James was arrested, Officer McKinley interviewed him at the police station downtown.  Officer McKinley read Mr. James his *Miranda* rights and Mr. James said that he understood his rights and would waive them and speak with Officer McKinley.  Officer McKinley told Mr. James that he wanted to speak with him about the check investigation, and also that he was interested in Mr. Schneider's whereabouts.  Mr. James explained that he had worked for Jim Price and A1 Bonding, and that he had met Mr. Schneider through Mr. Price.  He said that Mr. Schneider had worked for them "doing a few bond skips or something along those lines."  Officer McKinley asked Mr. James how he could locate Mr. Schneider.  Mr. James said that Mr. Schneider lived in the Wichita area, worked for a bonding company out of Wichita, came to town unannounced to do jobs for Mr. Price, then would leave unexpectedly.  According to Mr. James, while Mr. Schneider was in town he always stayed in a hotel and drove a nice vehicle.  Mr. James did not claim to know Mr. Schneider very well.

Officer McKinley asked Mr. James how he came to be driving Mr. Schneider's vehicle that day.  Mr. James explained that about 7:30 a.m. that morning, Mr. Schneider came by Mr. James's trailer unannounced, told Mr. James he was going to be running around with his girlfriend that day and was not going to need the vehicle, and gave the keys to the vehicle to Mr. James.  Mr. James told Officer McKinley that he did not use the vehicle at all

that day except mid-afternoon when he picked up Mr. Price from the hospital and took him home. Officer McKinley told Mr. James that the vehicle was allegedly used in an incident with stolen bushes that afternoon. At that point, Mr. James pondered that maybe Mr. Schneider had come and picked up the vehicle while Mr. James was asleep, then came back and dropped it off. Officer McKinley asked him how many sets of keys there were to the vehicle, and Mr. James responded that Mr. Schneider had two sets of keys. Officer McKinley later verified with the rental car company that only a single key was given to Mr. Schneider at the time he leased the vehicle.

Officer McKinley explained to Mr. James that he believed Mr. Schneider was the one who wrote the check and was Officer McKinley's focus. Mr. James professed not to know where the bushes were. When Officer McKinley asked Mr. James if they were planted outside his house, Mr. James said no, and suggested that Officer McKinley could go by his trailer and look. Mr. James gave him an address of a trailer at 101 North Michigan, Lot 88. Officer McKinley concluded his interview with Mr. James.

By this time, it was around the end of Officer McKinley's shift, and he relayed the information to the midnight shift and asked for their help. Another officer, Officer Hamilton, went to the trailer and reported back to Officer McKinley that the trailer did not appear to be occupied and did not have any bushes in front of it. He offered to go visit with Mr. Price and see if Mr. Price had any information. Officer Hamilton went to Mr. Price's apartment building at 3320 West 8th Street. When he arrived there, he informed Officer McKinley that outside the apartment building at one end he saw some freshly planted bushes with mulch as

well as packages of mulch and tools sitting out.  He advised Officer McKinley that there was a light on at Mr. Price's apartment three apartments down.  Officer McKinley left the station and met Officer Hamilton at the scene.

The two went and visited Mr. Price.  Mr. Price informed them that Mr. James was staying in the apartment at the opposite end of the building, that he had been there for several weeks at the very least, if not a couple of months, that he had not resided for some period of time on Michigan Street, and that there was an individual named Brian staying with him who the Prices claimed not to be familiar with but they said they knew he was from the Wichita area.  When the officers asked about the bushes, Mrs. Price said that she watched Mr. James "working real hard at spending the afternoon planting those bushes in front of his apartment there."

The two officers went down and attempted to initiate contact with anyone who might be inside Mr. James's residence.  They knocked on the front door and at the back of the residence.  At one point, Officer Hamilton saw someone inside and that person had a weapon pointed at him.

Officer McKinley was aware that Mr. James had bonded out of jail immediately.  Unaware of Mr. James's location, Officer McKinley called the cellular telephone number Mr. James had given him.  He explained the situation to Mr. James, shared information that led Mr. James to understand that Officer McKinley was aware of more information than Mr. James had divulged to him during their interview earlier that evening, and told Mr. James he had half a dozen police officers there.  Mr. James admitted that it was probably Mr.

11

Schneider inside the residence.  Officer McKinley asked Mr. James if he was planning to come home.  Mr. James said that he was on his way to Kansas City, but he stated that he would call Mr. Schneider on his cell phone and encourage him to surrender.  Shortly thereafter, Mr. James contacted Officer McKinley and said that Mr. Schneider was inside and was ready to give himself up.

After that, Officer McKinley was able to contact Mr. Schneider and speak to him directly.  Mr. Schneider stated that he was inside, that he was aware that he had an outstanding warrant, and that he knew they were there to arrest him.  Officer McKinley explained that he was concerned because an officer looked in the window and saw a weapon pointed towards him.  Mr. Schneider said he was asleep and when he heard someone banging on the door or the window he thought someone was trying to break in, and his first reaction had been to point the taser at whoever was at the window.  He said he did not realize it was the police.  Mr. Schneider said he would not mind giving himself up, that he was tired of running, but that he really wanted to see his girlfriend to say goodbye because he was probably going to be locked up for a long time, and he wanted to smoke a cigarette.  Officer McKinley told him to leave any kind of weapon, come to the front door, and he would meet him there.  Mr. Schneider said that was okay as long as he was allowed to stay at the house and smoke a cigarette and wait to visit with his girlfriend for a few minutes.  Mr. Schneider stated that he did not want her to be visiting with him through the back window of a patrol car.  He wanted to be able to say goodbye to her and knew he was going to be in custody a long time.  Officer McKinley told him that was fine, but that he wanted him safely taken into

custody first.  Mr. Schneider then followed Officer McKinley's instructions.  Officers walked up to the threshold of the front door, handcuffed Mr. Schneider, and took him into custody. At this time, it was approximately 1:27 a.m.

Officer McKinley told Mr. Schneider he was going to honor his request as agreed. Mr. Schneider said he did not want to sit in the car.  He wanted to smoke a cigarette and wait for his girlfriend; it was cold so he asked if they could wait there inside.  Mr. Schneider said there should not be anyone else inside.  Officer McKinley testified, however, that he did not really know Mr. James's physical location.  He felt somewhat comfortable that he was not inside the apartment, but he knew Mr. James had been dishonest with him during the interview and he was not comfortable with the belief that he was on his way to Kansas City. Officer McKinley was not certain whether Mr. James was in the apartment, but guessed that he probably was not.  The officers went in and briefly made sure no one else was inside the house.

On cross-examination, Officer McKinley elaborated on the justification for the protective sweep.  He testified as follows:

> Well, I am absolutely not going inside that apartment to sit at a kitchen table with him unless I am reasonably certain that there's not another person inside with a weapon.  I have not identified the arm [with the weapon].  Although he did state he was the one that pointed the taser, I don't know.  I don't know who it was.  So I've not positively identified the person who had this alleged weapon, and the fact that I'm going to step inside his door and visit with him for several minutes or wait for his girlfriend or what have you, it's imperative that there's nobody else in there that's going to threaten myself and the other officers that I'm with.
>
> . . . .

13

I'm saying in a situation where we are effecting an arrest on a felony suspect who – we know that an occupant, be it unidentified positively, an occupant pointed a weapon at a police officer, I absolutely want to make sure that there's not another individual in there that's going to point a weapon at my back while I'm standing at a kitchen table with Mr. Schneider while he's smoking a cigarette.

Mr. Schneider sat down at the kitchen table, the officers got him a cigarette, and he waited for his girlfriend. She arrived about ten minutes later. They visited for about ten to fifteen minutes while they smoked cigarettes, then the officers walked Mr. Schneider out of the house to the patrol car.

2.    *Testimony of Officer Larry Hamilton*

Larry Hamilton, another police officer with the City of Lawrence, also testified at the suppression hearing. He came on duty around 11:00 p.m. the evening of October 30, 2006. During the briefing at the beginning of his shift, his shift supervisor, Sergeant Dave Hubble, advised the officers that Mr. James had been arrested, that Officer McKinley was currently interviewing him, that he was associated with an individual by the name of Brian Schneider, and that Mr. Schneider was currently wanted for a Kansas Department of Corrections parole violation. Officer Hamilton spoke with Officer McKinley, and Officer McKinley advised him that Mr. Schneider was believed to have fraudulently purchased some bushes and mulch at Clinton Parkway Nursery in Lawrence earlier that day using either a forged or a fraudulent check. Officer Hamilton recalled from prior experience that Jim Price lived at 3320 West 8th Street, Apartment D, that Mr. Price runs A1 Bail Bonds, and that Mr. James was associated with A1 Bail Bonds. Officer Hamilton decided to go to 3320 West 8th Street.

14

Upon arriving there, a vehicle was parked outside of the building which was registered to a Melissa Schneider and another individual from Salina, Kansas. He called Sergeant Hubble and advised that there was a vehicle registered to a Schneider in close proximity to the Prices' apartment. After he spoke with Sergeant Hubble, he walked up on foot and saw some bushes and mulch which appeared to be new located at the far south end of the apartment building outside of Apartment A. Recalling his conversation earlier that evening with Officer McKinley, he called and relayed this information to Officer McKinley. Officer McKinley said he would be responding there. Officer Hamilton summoned additional units.

Officers Hamilton and McKinley contacted the Prices in Apartment D. Officer Hamilton asked Mr. Price if he knew where Mr. James was staying, and Mr. Price responded that Mr. James lived in Apartment A. Officer Hamilton asked Mr. Price who else lived with him, and Mr. Price said "a white guy named Brian from Wichita." Officer Hamilton knew Mr. Schneider was from Wichita based on information he had received from his shift briefing.

Officers Hamilton and McKinley left Apartment D and went to the front door of Apartment A. They knocked on the front door. Officer Hamilton could see a light in a back bedroom through the front window. He knocked on the window rather loudly, trying to wake someone up. At this point, it was about midnight or a quarter after midnight. When no one answered the door or came to the window, Officer Hamilton walked around to the west side of the building to the window where he had seen the light shining and knocked on the window. He was able to see inside the residence, but only by peeking through small holes

15

in the blinds that were covering the window.  The only thing he could see was the forearm of a Caucasian person holding a black taser or handgun pointed directly at the window where Officer Hamilton was located.  He yelled to Officer McKinley, advising him that there was an armed subject in the residence.  He then cleared the apartment building located directly behind (to the west of) 3320 West 8th Street.  He told the occupants what was going on and asked them to leave their apartments in case there might be gunshots.

Eventually, Officer Hamilton became aware that Mr. Schneider had been taken into custody.  He and another officer placed Mr. Schneider in handcuffs.  According to Officer Hamilton, Mr. Schneider was shaking, probably because it was very cold that evening.  He could not recall the temperature, but recalled that he and other officers had commented to each other that they were freezing out there.  Other officers entered the apartment shortly thereafter because Mr. Schneider had expressed that he wanted to go into the apartment to have a cigarette and wait for his girlfriend.  After the officers made "a protective sweep to ensure that no one else was inside of the apartment," Officer Hamilton escorted Mr. Schneider inside the front door and had a seat in the kitchen area where they waited for his girlfriend to arrive.

*3.     Testimony of Officer Robert Neff*

Robert Neff, another police officer with the City of Lawrence, also came on duty around 11:00 p.m. the evening of October 30, 2006.  During his shift he was summoned to 3320 West 8th Street.  After Mr. Schneider was placed under arrest, he and Sergeant Hubble agreed that they should go in and check the apartment for anyone else.  He testified at the

16

suppression hearing that, although Mr. Schneider had exited the apartment, they did not know whether there might have been somebody else in the apartment.

Sergeant Hubble entered first and Officer Neff entered right after him.  Officer Neff checked the north bedroom.  In that bedroom was a closet with a sliding door.  He did not see anyone in the closet, but in plain view noticed a rifle leaning up against the wall and a military-style ammunition can.  He also peeked under the bed, and no one was there.  He then went to the bedroom right next to it.  On the bed in the second bedroom he saw lying on top of the bedspread what appeared at first to be a Glock handgun, but he determined upon closer look that it was a taser.  He opened the door to the closet in that room and saw "a lot of clothing" with "bail bondsman written all over them."

Following the protective sweep, Mr. Schneider was allowed to go back into the apartment.  At Mr. Schneider's request, officers retrieved his cigarette, lighter, and wallet from the second bedroom.  Officer Neff stood guard over Mr. Schneider while he smoked a cigarette and waited for his girlfriend.

### 4.   *Testimony of Detective Mike McAtee*

Detective Mike McAtee with the Lawrence Police Department also testified during the suppression hearing.[2]  He testified that the reason officers would want to negotiate with

---

[2] Detective McAtee's role in the incident involved applying for and receiving a search warrant for the apartment in the hours following Mr. Schneider's arrest.  The prosecution presented his testimony evidently in anticipation of the possibility that counsel for Mr. James might challenge the constitutionality of the search warrant.  Mr. James has not, however, challenged the search warrant.  The court therefore confines its discussion of the evidence to that which is relevant to Mr. James's suppression arguments which, insofar as they pertain

someone like Mr. Schneider and also carry out the promises made, as Officer McKinley did, is twofold: first, to reach a peaceful resolution to a potentially dangerous situation. Additionally, in this case Mr. Schneider was a suspect not only in the Clinton Parkway Nursery investigation, but also in another investigation involving the Wichita Police Department. So, the negotiation process not only allows an officer to build rapport to end the current situation peacefully, but also helps to establish rapport for potentially interviewing the individual as a suspect.

**B.    Discussion**

Defendant James contends that the officers' protective sweep of the apartment was unconstitutional. The thrust of his argument is that after Mr. Schneider was placed under arrest outside of the apartment, there was no need for them to re-enter the apartment. He argues that officers should not be allowed to essentially capitalize on such negotiations by negotiating their way into a residence. Additionally, he argues that the protective sweep was unnecessary because the officers had no reason to believe that there was another person present in the apartment after they arrested Mr. Schneider. The court finds defendant's arguments to be without merit. As explained below, the officers' initial entry into the apartment was justified by Mr. Schneider's authority to consent to their entry and by the fact that he validly and voluntarily consented to their entry when he essentially invited them into the apartment by asking to wait there after being placed under arrest, that their initial entry

---

to the officers' search of the apartment, all relate to the officers' initial entry into and subsequent protective sweep of the apartment.

was within the scope of his consent, and that once inside the apartment their subsequent protective sweep was justified by legitimate safety concerns.

       *1.       Consent to Enter Apartment*

       It is well settled that voluntary consent can obviate the warrant requirement of the Fourth Amendment. *United States v. Brooks*, 427 F.3d 1246, 1249 (10th Cir. 2005). Consequently, "[c]onsent can justify an entry into a home, regardless of whether there is probable cause." *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006). Two requirements must be satisfied: (1) the consent must have been voluntary, and (2) the search must not have exceeded the scope of the consent. *United States v. Sims*, 428 F.3d 945, 952 (10th Cir. 2005).

       The voluntariness of consent is a factual issue, determined from the totality of all the circumstances. *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). "For consent to be valid, two conditions must be met: (1) There must be a [sic] clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *Id.* (quotation omitted). In this case, the court readily finds that Mr. Schneider voluntarily consented to the officer's entry into the apartment: *he requested* that they wait inside. The primary thrust of defendant's argument that the court should suppress the evidence from the apartment search is that the officers should not be able to "negotiate their way in" to an arrestee's residence. This argument, however, is flatly contradicted by the evidence. The evidence could not be more clear that it was at Mr. Schneider's insistence during negotiations

19

with Officer McKinley that after he gave himself up he wanted to go back inside and have a cigarette while waiting for his girlfriend to arrive.  There was good reason for this, as the evidence reflects that it was cold outside that evening.  The officers at the scene were therefore led to be in the apartment by Mr. Schneider's own insistence, not by virtue of any request by law enforcement officers for permission to enter the apartment.  The fact that Mr. Schneider was placed under arrest after negotiating the re-entry into the apartment does not vitiate his consent. *Cf. United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) ("Merely because a person is detained or in custody does not preclude voluntary consent.").  He asked to go back into the apartment.  The officers merely abided in good faith by what they viewed to be a reasonable request by him.

Additionally, the court finds that Mr. Schneider had actual authority, or at a bare minimum at least apparent authority, to consent to the entry into the residence.  Voluntary consent may be obtained "either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriquez*, 497 U.S. 177, 181 (1990); *accord United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004).  A third party's consent is valid if that person has either actual authority or apparent authority to consent to a search of the property. *Kimoana*, 383 F.3d at 1221.  A person has actual authority if he or she has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it. *Id.*  The gravamen of the actual authority rule is that it is reasonable to recognize that a co-habitant has the right to permit the inspection in his or her own right, and the others have assumed the risk that one of their number might permit

20

the common area to be searched.  *Id.*  Under the test for apparent authority, the Fourth

Amendment is not violated when officers reasonably, although perhaps erroneously, believe

that the person who consents to their entry has the authority to consent.  *Id.*  The test for

determining the reasonableness of the officer's belief is an objective one; it is whether the

facts available to the officer at the moment warrant a person of reasonable caution to believe

that the consenting party had authority over the premises.  *Id.* at 1222.  Officers must

evaluate the surrounding circumstances in order to determine whether a reasonable person

would act upon the invitation without further inquiry.  *Id.*

In this case, the evidence reflected that Mr. Schneider had actual authority because

he had mutual use of the property by virtue of joint access.  The most credible evidence on

this point was the testimony of Officers McKinley and Hamilton, both of whom testified that

Mr. Price advised them that Mr. James was living in the apartment with an individual named

Brian from Wichita.  Although Officer McKinley testified that during his interview with Mr.

James, Mr. James did not claim to know Mr. Schneider very well, Officer McKinley had

legitimate reasons to disbelieve Mr. James.  By comparison, Mr. Price presumably would

have been disinterested in who was living in Apartment A and therefore likely would have

been more truthful with the officers, particularly in light of the fact that Officer Hamilton was

involved with taking Mr. Price to the hospital only approximately a week prior.  At a bare

minimum, Mr. Schneider had apparent authority to consent to the officers' entry into the

apartment.  The facts available to the officers at that moment included Mr. Price's statement

that Mr. James was living there along with another individual named Brian from Wichita

(who officers reasonably believed to be Mr. Schneider) and they found Mr. Schneider in a bedroom of the apartment around midnight while Mr. James (the other resident) was not there at all, thus corroborating Mr. Price's statement that Mr. Schneider was living there. This would warrant a person of reasonable caution to believe that Mr. Schneider had authority over the premises.

The officers' initial entry into the apartment did not exceed the scope of Mr. Schneider's consent. "The scope of consent is a fact question based upon what a reasonable person would have understood under the circumstances." *United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005). Here, a reasonable person would have understood that, because Mr. Schneider wanted to wait inside the apartment after being placed under arrest, that the officers could enter the apartment with him. This is precisely what they did, and therefore their entry into the apartment was within the scope of his consent.

2.      *Subsequent Protective Sweep*

Once inside the apartment, the officers' search of the apartment was constitutionally justified as a protective sweep. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Such a search is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.*; *accord United States v. Carter*, 360 F.3d 1235, 1242 (10th Cir. 2004). It is permitted if "there [are] articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an

individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334; *accord United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007).  If police officers conducting a proper protective sweep of a dwelling come across evidence of criminal activity in plain view they may seize it, so long as that evidence is such that a reasonable officer would conclude, based on experience and the circumstances, that the item is probably incriminating. *United States v. Flores*, 149 F.3d 1272, 1278 (10th Cir. 1998).

Given the circumstances confronting the officers in this case, their cursory visual inspection of the apartment of those places in which a person might be hiding (e.g., under beds and in closets) was reasonable under the Fourth Amendment.  It was at Mr. Schneider's insistence during negotiations that officers were placed in the potentially vulnerable situation of standing guard over him inside the apartment.  *See Carter*, 360 F.3d at 1242 ("Officers within the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home.").  The evidence showed specific facts that would warrant a reasonable officer to believe that the apartment may have harbored an individual posing a danger to the officers and potentially others on the arrest scene.  The officers had a clear indication that someone in the house had recently possessed a weapon and was poised to use it.  In fact, their concern was so serious that they cleared the occupants from the neighboring apartment building around midnight on a cold night, thus evidencing the sincerity of their safety concerns.  Although Mr. Schneider told Officer McKinley that he was the individual with the taser seen by Officer Hamilton, the officers were not required to accept this representation as true.  Mr. Schneider was a fugitive wanted on a felony warrant.  He had

ignored the officers' knocking on the doors and windows until he received a call on his cell phone from Mr. James alerting him to the fact that a significant number of officers were there to arrest him. Although Officer McKinley testified that he did not believe Mr. James had returned to the apartment after being released from jail, he did not know for sure. "Reasonable suspicion may arise when officers know an occupant has a weapon, has threatened to use it in an unlawful manner, and may be present in the residence." *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006). This is quintessentially the circumstances that exist in this case because Officer Hamilton saw someone in the apartment holding a weapon pointed directly at him, and the officers were unable to dispel their suspicion that the armed person may have been someone other than Mr. Schneider without performing a protective sweep of the apartment. Under these circumstances, the court has no difficulty concluding that a "reasonable officer would take precautions to make sure that no hidden threat was lurking in the house." *United States v. Hauk*, 412 F.3d 1179, 1192 (10th Cir. 2005) (permitting a protective sweep where a second individual was thought to be present during the arrest of a parole violator). Consequently, officers were constitutionally entitled to seize the incriminating evidence found in plain view during the protective sweep.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant James' Motion to Suppress Evidence (doc. #30) is denied.

**IT IS SO ORDERED** this 11th day of April, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge